IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| CHARLES WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:07cv560-MHT |
| | ) | (WO) |
| ALABAMA DEPARTMENT OF | ) | |
| HUMAN RESOURCES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

Plaintiff Charles Wilson brings federal employment

discrimination claims against the following

defendants: the Alabama Department of Human Resources

(DHR), DHR Commissioner Nancy Buckner, the Alabama

Personnel Department (SPD), and SPD Director Jackie

Graham.  Wilson charges DHR and Buckner with engaging in

racial discrimination in respect to his job

classification and compensation, and SPD and Graham with

perpetuating discrimination in the allocation of

promotions.  He asserts each of these claims pursuant to

42 U.S.C. § 1981 (by and through 42 U.S.C. § 1983) and

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981a, 2000e to 2000e-17. This court has original jurisdiction over the Title VII claims under 42 U.S.C. § 2000e-5(f)(3) and the § 1981 claims pursuant to 28 U.S.C. § 1343

The defendants now move for summary judgment on all claims. For the reasons that follow, the defendants' motions will be granted.


I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Under Rule 56, the court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita

Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S.
574, 587 (1986).


## II. BACKGROUND

Wilson was hired as a Social Worker I (SWI) within
DHR's Calhoun County Office in November 1973. He was
subsequently promoted to Social Worker II (SWII) in 1982.
At the time this suit arose, the county office operated
two separate assistance programs: the Family and Children
Services (FCS) Division and the Adult Services (AS)
Division. Wilson served as a social worker in the latter
division. In this capacity, he conducted case management
and performed fieldwork on a regular basis.

From 1992 to 1993, the AS Division was staffed by
four social workers, including Wilson, all of whom were
supervised by June Ledbetter. The Director of Calhoun
County at that time was Erin Snowden, and the Assistant
Director was Pat Kettles. On March 18, 1992, Kettles and
Ledbetter issued a reprimand to Wilson after the agency

had been unable to reach Wilson on two occasions while he was assigned to "after hours duty." Pl.'s Ex. 34 (doc. no. 62-5). Wilson's supervisors later discovered that he had supplied the county's answering service with disconnected or inaccurate phone numbers, so that he was unreachable during the time he was on-call. The failure to be available during on-call hours constituted a violation of state personnel rules, and Wilson's superiors warned him that similar future conduct could lead to suspension or dismissal.

On May 1, 1993, DHR implemented a new classification system applicable to all agency employees. Prior to the reclassification, DHR sent each county the job specifications for the newly created positions of Service Social Worker I (SSWI) and Service Social Worker II (SSWII). Snowden and Ledbetter reviewed these specifications in light of the duties that the social workers within the AS Division were already performing, and then reclassified the employees accordingly. Social

workers who performed fieldwork and maintained an active caseload were reclassified as SSWIIs, while those who performed primarily office-related duties were reclassified as SSWIs.  Wilson was reclassified as a SSWI, and he was notified of his reclassification in June 1993.

Under the new system, Wilson retained the same job responsibilities and compensation that he had as a SWII. However, had he been categorized as a SSWII at the time of the reclassification, he would have received a pay step increase.  Of the remaining social workers in the AS Division, two white females were reclassified as SSWIIs from their original positions as SWIIs, and a white male in the FCS Division was reclassified from a SWII to a SSWII.  Additionally, at least four African-American employees in the FCS Division were reclassified from SWIs to SSWIIs based on their responsibilities.  Wilson was the only DHR employee reclassified from SWII to SSWI.

The defendants maintain that Wilson's reclassification as a SSWI was in accordance with his routine occupational duties; and that, following his 1992 reprimand, he was allocated only the most "basic" responsibilities and not allowed to perform more intensive social-work activities. Snowden Dep. at 52 (doc. no. 42-4). Director Snowden testified that, after the reprimand, Calhoun County encountered "perpetual problems related to [Wilson's] negligence." Id. at 81. Wilson contests this evaluation. In both 1992 and 1993, Wilson was rated as "meets standards" on his personnel evaluations, and, from 1994 to 1996, he was reviewed as "exceeds standards." Pl.'s Exs. 35-36, 38-40 (doc. no. 62).

After Wilson learned of his new position title, he contacted DHR to determine why he had not been reclassified as a SSWII. On June 8, 1993, the DHR Personnel Director, Waldo Spencer, responded to Wilson's request and advised him to submit to management a Form 40

describing his current duties and requesting to be reclassified as a SSWII. On April 26, 1994, ten months after he was alerted to his reclassification, Supervisor Ledbetter submitted a Form 40 on Wilson's behalf to Barbara Lemley, DHR Director of Administrative Support, asking that Wilson's job position "be changed to conform with his duties." Am. Compl. at 5 (doc. no. 20). The request was approved by Snowden before being submitted to Lemley.

On June 1, 1994, Lemley issued a memorandum to Snowden and Wilson, noting that Wilson's current assigned activities "would qualify [for] the position as a Service Social Worker II," but then stating that "the educational qualifications for Service Social Worker II have been changed to a social work related degree and Mr. Wilson's degree [in history] does not qualify." Pl.'s Ex. 14 (doc. no. 61-5). A social work degree was not necessary for appointment to SSWII at the time of the reclassification in May 1993. Lemley also affirmed that,

after the reclassification, other SSWIs lacked the educational credentials to be promoted to SSWII; consequently, DHR was developing "a mechanism" to allow these individuals to be reclassified as SSWIIs without the requisite degrees. Id.

In January 1995, Personnel Director Spencer contacted SPD and requested that Wilson's title be changed to SSWII.[1] SPD approved the title change. However, Wilson was not awarded an increase in his compensation due to a legislative prohibition on merit-based pay raises in effect in 1994 and 1995.

Wilson filed his first charge with the Equal Employment Opportunity Commission (EEOC) on June 23,

---

1. Spencer wrote that: "Due to miscommunication in the Calhoun County Department of Human Resources, Mr. Wilson's classification was not allocated to Service Social Worker II during the implementation of the Department's new classification system. Changing Mr. Wilson's classification will place him in the classification commensurate with the job duties he has been performing since before implementation of [the reclassification]." Pl.'s Ex. 31 (doc. no. 62-2).

1994.[2]  On November 23, 1998, he moved to intervene in the case of <u>Crum et al v. State of Alabama</u>, consolidated as <u>In re Employment Discrimination Litigation Against the State of Alabama</u>, CV 945-356-N.[3]  The intervention was granted on May 18, 2007, and this case was subsequently converted into a separate lawsuit.

## III. DISCUSSION

As a preliminary matter, Wilson improperly asserted violations of 42 U.S.C. §§ 1981 and 1983 against

---

2.   The charge listed a variety of allegations, including a complaint that Wilson had been "the victim of racial discrimination and/or retaliation with respect to appointments, selection decisions, job assignments, promotions, training, discipline, compensation benefits, evaluations, service ratings, and other terms and conditions of employment."  Pl.'s Ex. 29 (doc. no. 61-20).

3.   In his EEOC charge, Wilson refers to the <u>Crum</u> litigation and states that his claims "challenge the same racial discrimination as have previous charges filed against the respondents."  Pl.'s Ex. 29.  He notes that "[s]uch previous charges have resulted in litigation on behalf of a putative class of which I am a member for the racially discriminatory conduct complained of in both this charge and the earlier [Crum] charge."  <u>Id</u>.

instruments of the Alabama government. Agencies of the state are immune from suit under the Eleventh Amendment, regardless of the relief requested. <u>See</u> <u>Cory v. White</u>, 457 U.S. 85, 90-91 (1982) (citing <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974); <u>see</u> <u>also</u> <u>Carr v. City of Florence</u>, 916 F.2d 1521, 1525 (11th Cir. 1990) (noting that Alabama has not waived its Eleventh Amendment immunity). As to DHR and SPD, Wilson admits they are immune from suit under § 1981, as enacted through § 1983. He also concedes that, as Buckner and Graham are sued in their official capacities, they are immune from suit for monetary damages, and are unnecessary parties to the Title VII claims. Wilson may legally maintain suit for injunctive relief against these officials. <u>See</u> <u>Taylor v. Alabama</u>, 95 F. Supp. 2d 1297, 1310 (M.D. Ala. 2000) (citing <u>Ex Parte Young</u>, 209 U.S. 123 (1908)).

Wilson's remaining § 1981 and Title VII claims are governed by the familiar burden-shifting scheme set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802

(1973). See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and 42 U.S.C. § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."). To survive summary judgment, Wilson may establish a prima-facie case of disparate treatment by showing that he was (1) a qualified member of a protected class; (2) subject to an adverse employment action; and (3) treated less favorably than a similarly situated individual outside the protected class. See Wilson v. B/E/ Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). If Wilson establishes these elements, then the burden shifts to the defendants to set forth a legitimate and non-discriminatory reason for their actions. Id. The defendants' evidence should "allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory

animus." <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 257 (1981). If the defendants articulate one or more non-discriminatory reasons, "then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is pretext for illegal discrimination." <u>Wilson</u>, 376 F.3d at 1087.

Wilson brings three distinct claims. He contends that DHR and Buckner engaged in unlawful discrimination as to his reclassification (reclassification claim), and as to his compensation (compensation claim). He charges SPD and Graham independently with discrimination in the allocation of promotions (promotions claim).

Turning first to the reclassification claim, the court assumes that Wilson has established a prima-facie case of discrimination. Nonetheless, his suit against DHR and Buckner will not proceed, as Wilson cannot offer sufficient evidence to demonstrate that his employer's proffered reason for reclassifying him as a SSWI was a

pretext for engaging in illegal discrimination. Therefore, there is no indication that either DHR or Buckner was motivated by racial animus in failing to reclassify Wilson as a SSWII in May 1993.

DHR and Buckner allege that Wilson's reclassification was commensurate with the duties he was performing during the spring of 1993. They state that for the one-year period leading up to the reclassification and following his reprimand, he "did not perform the intensive social work activities, such as field work[,] that [are] part of the SSWII job specifications." DHR Defs.' Br. at 30 (doc. no. 41). DHR and Buckner allege that Wilson's reclassification was driven entirely by his responsibilities, and not by either his race or his poor performance evaluation in 1992.

In response, Wilson offers several factors that purportedly give rise to a finding of discriminatory animus. First and foremost, Wilson states that, though he and William Baker, a white social worker within the

FCS Division, maintained a "nearly identical" set of duties, <u>Wilson</u>, 376 F.3d at 1091 ("The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."), Baker was reclassified as a SSWII in May 1993, while he was reclassified as a SSWI. Wilson maintains that his Form 40 and Baker's performance evaluation listed substantially overlapping job responsibilities, which included processing complaints of adult and child abuse, determining eligibility for services, providing referrals, conducting after hours coverage on a rotating basis, and completing general administrative work. Pl.'s Br. at 34. Consequently, Wilson alleges that he suffered adverse treatment in comparison to a member of an unprotected class, which constitutes evidence of pretext.

Wilson and Baker are not, however, legally sufficient comparators for the purposes of an employment discrimination claim. In order to constitute "similarly situated" employees, the individuals must have "(1) dealt

with the same supervisor, (2) been subject to the same standards, and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Sanguinetti v. United Parcel Service, Inc., 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000) (Ryskamp, J.). See also Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (noting that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"). Here, Baker was employed in a division different from Wilson, he was supervised by a different person, and he performed different tasks. Snowden could not have unfairly favored Baker in the reclassification process, when she was not in charge of his reclassification. And though Wilson attests that he and Baker maintained the same responsibilities on paper, Wilson does not rebut DHR's evidence that Baker was actually performing supplementary duties, conducting "caseload coverage" for absent social

workers;[4] overseeing crisis intervention; participating on community boards; providing child protective services; and administering the FCS Division when his supervisor was out of the office. DHR Defs.' Reply Br. at 24 (doc. no. 75).

Therefore, while Wilson and Baker were both employed as social workers within Calhoun County, the circumstances of their employment differed significantly. Because the two employees were not similarly situated, Baker's reclassification cannot serve as evidence of pretext in Wilson's discrimination claim against DHR and Buckner.

As further evidence of discrimination, Wilson highlights the testimony of Sylvester Smith, Director of the DHR Civil Rights/Equal Opportunity Office, who stated

---

4. DHR and Buckner distinguish between "after hours" duty, assigned on a rotating basis to both SSWIs and SSWIIs, and caseload coverage for absent social workers, which entailed regular fieldwork. DHR Defs.' Reply Br. at 23 (doc. no. 75). They note that while both Baker and Wilson provided after hours coverage, only Baker performed case work on behalf of other social workers.

that Wilson's supervisor, June Ledbetter, "believed that Mr. Wilson did not receive a recommendation for the Social Service Worker II position by Erin Snowden[,] not because of Mr. Wilson's job performance at the time the decision was made, but because of previous evaluations on him."  Pl.'s Ex. 8 at 3 (doc. no. 60-9).  Wilson asserts that this statement, which contradicts Snowden's allegations of his poor performance, is sufficient to establish pretext.  The court disagrees.  Even if this statement were admissible, see Macuba v. DeBoer, 193 F.3d 1316, 1323 (11th Cir. 1999) (noting that "inadmissible hearsay cannot be considered on a motion for summary judgment") (internal citations omitted), it is irrelevant to Wilson's claim.  DHR and Buckner allege repeatedly that Wilson's reclassification was based entirely on the tasks he was actually performing in the spring of 1993. The quality of his performance did not factor into his reclassification and, thus, should not factor into an analysis of his discrimination claim.

Similarly, Wilson alleges pretext based on the fact that "his job duties did not change from the time he was put on intake in 1992 [through] the time period he was ultimately reclassified as a Service Social Worker II" in 1995. Pl.'s Suppl. Reply Br. at 12 (doc. no. 103-2). Wilson states that because he was not reclassified in 1993, but was subsequently promoted to a SSWII position in 1995 without any interceding changes in his responsibilities, Snowden acted with discriminatory intent during the original reclassification.[5] Wilson's assertion presumes too much. Merely because a member of DHR's central leadership upgraded Wilson's classification in 1995 does not indicate that the Calhoun County

---

5. Wilson relies heavily on Personnel Director Spencer's 1995 letter to SPD as evidence that discrimination influenced the 1993 reclassification process. In this letter, Spencer claimed that "[c]hanging Mr. Wilson's classification will place him in the classification commensurate with the job duties <u>he has been performing since before implementation of [the reclassification</u>]." Pl.'s Ex. 31 (emphasis added).

18

director acted with prejudice when she evaluated the duties he was performing in 1993.[6]

Most significantly, Wilson has merely suggested that management officials differed in how he should be treated; he has, however, provided no evidence whatsoever that ties his treatment to race, such as that a supervisor treated a similarly situated white person differently from the way he was treated or that there was otherwise an environment of discrimination against black persons in the place where he worked. In fact, Wilson admitted that he was never subjected to racist statements or behavior at work, and he testified that each of his supervisors treated him "fairly and with respect." Wilson dep. at 85 (doc. no. 44-3). Therefore, Wilson's reclassification in 1995 does not give rise to a suggestion of racial bias.

_____

6. It is especially noteworthy that Spencer was located in DHR's state headquarters in Montgomery, Alabama, and would have little reason to be familiar with Wilson's regular duties and responsibilities in the Calhoun County office, either in 1993 or in 1995.

Wilson also argues that discriminatory intent may be presumed based on Snowden's racist behavior toward other DHR employees. For instance, in a letter from Ledbetter to the DHR Board of Directors, Ledbetter complained of Snowden's anger management problems and alleged that Snowden engaged in a "verbal beating" of another DHR employee, also African-American. Pl.'s Ex. 43 (doc. no. 62-14). However, Ledbetter does not maintain that Snowden acted in a discriminatory fashion; she merely suggests that Snowden is an inept supervisor. In fact, in this same letter, Ledbetter, a white woman, also complained that Snowden severely rebuked her in the presence of subordinate employees. Ledbetter's words provide strong evidence that Snowden was neither an effective nor a well-liked director. However, there is nothing in the document to suggest that Snowden's actions were performed with racial animus.[7]

---

7. As additional evidence of discrimination, Wilson submits a letter from an anonymous employee, addressed to the Acting Commissioner of the DHR in March 1995, in
(continued...)

Further, Wilson alleges that Snowden failed to engage in "progressive discipline" before reclassifying him as a SSWI, in contravention of DHR policy.[8]  He states that Snowden's departure from procedure is evidence of pretext, and thus, discriminatory intent.  <u>See</u> Pl.'s Br. at 28 (doc. no. 59) ("Failure to follow procedures, including express language of a corporate policy statement[,] is a factor that can be considered to be determinative of discriminatory intent.") (citing <u>Harris</u>

---

7. (...continued)
which the employee alleged that Snowden was "racially prejudiced," intent on hiring only white employees for supervisory positions, and culpable of voicing racial slurs, including referring to a group of black employees as "being from the slums."  Pl.'s Ex. 44 (doc. no. 62-15).  This letter constitutes hearsay, and its assertions are therefore inadmissible for consideration at the summary-judgment stage.  Furthermore, as the employee did not sign her name, it is impossible to judge the authenticity of the statements.  <u>See</u> <u>U.S. v. Siddiqui</u>, 235 F.3d 1318, 1322 (11th Cir. 2000) ("Under Fed. R. Evid. 901(a), documents must be properly authenticated as a condition precedent to their admissibility 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'").

8. DHR policy requires that employees be immediately informed of problems that could affect their compensation rates and responsibility levels.

v. Birmingham Bd. of Educ., 712 F.2d 1377, 1383 (11th Cir. 1983); Watson v. National Linen Service, 686 F.2d 877, 881 (11th Cir. 1982)).

It is true that discriminatory motive may sometimes be inferred when a decision-maker departs from well-established procedures and criteria. See Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 951-52 (11th Cir. 1991) ("[S]election processes which are conducted in an ad hoc or discretionary manner must be viewed with particular suspicion."). But again, Wilson's performance is not what is at issue in this case. Whether or not Snowden informed Wilson of his shortcomings is irrelevant to the claim at hand, and her failure to follow internal procedures in this context does not establish pretext. And, as stated, Wilson has simply failed to provide any evidence that ties Snowden's actions to race, such as that Snowden treated a similarly situated white person differently from the way she treated Wilson or that there was otherwise an environment

of discrimination against black persons in the place where Wilson worked.

However, there is also evidence that Snowden did not notify Wilson of his new classification before it went into effect, as required by DHR policy. This finding is clearly relevant to the instant claim. Nevertheless, a supervisor's failure to follow certain procedures, presented in the absence of any other indicia of racial discrimination, does not establish pretext. This is especially true here, as Snowden did not discuss the reclassification process with any employee under her supervision prior to approving the final classification changes. See Brown, 939 F.2d at 952 (failing to find pretext where "the practices complained of affected the two white candidates in precisely the same manner that they affected the plaintiff"). There is no evidence that Wilson was singled out in this regard.

Employing a more structural argument, Wilson observes that "[o]nly one employee out of 800 Social Worker II's who were reclassified was reclassified as a Service

Social Worker I--Charles Wilson, who is black." Pl.'s Br. at 36. However, DHR reclassified both white and African-American employees as SSWIIs, and Snowden herself recommended that four black employees within the FCS Division be reclassified from SWIs to SSWIIs.

In sum, Wilson has failed to provide sufficient evidence to support the conclusion that DHR and Buckner utilized the reclassification process as a pretext for discrimination.

Wilson's second claim against DHR and Buckner, alleging discrimination based on inadequate compensation, must also fail. He asserts that, because he was not reclassified as a SSWII in 1993, he did not receive the pay raise he otherwise would have earned. However, the success of Wilson's compensation claim is clearly dependent on establishing sufficient evidence of discrimination in the reclassification process. Since he has failed to satisfy his burden of proof as to the reclassification claim, the compensation claim fails as well.

Finally, Wilson claims that SPD and Graham are independently responsible for allocating promotions in a discriminatory manner. Specifically, he states that they failed to ensure that the reclassification was instituted objectively and without racial bias. However, because he did not provide sufficient evidence so that a reasonable jury could find DHR and Buckner acted with racial animus in the reclassification process, his claim of discriminatory intent based on SPD's supervision of the reclassification also falls short.

***

For the foregoing reasons, DHR and Buckner's motion for summary judgment and SPD and Graham's motion for summary judgment will be granted in all respects. An appropriate judgment will be entered.

DONE, this the 26th day of March, 2010.

            /s/ Myron H. Thompson
        UNITED STATES DISTRICT JUDGE